# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Target Corporation,

                Plaintiff,                      Civ. No. 10-4810 (RHK/JSM)

v.                                     **MEMORANDUM OPINION**
                                     **AND ORDER**

Greenberg Farrow Architecture,
Incorporated,

                Defendant/
                Third-Party Plaintiff,

v.

Jeffrey M. Brown & Associates, Inc.,
KNS Building Restoration, Inc.,
Interstate Industrial Corp., John Doe
and Mary Roe,

                Third-Party Defendants.

---

James J. Hartnett, IV, Michelle E. Weinberg, Michael A. Ponto, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Plaintiff.

Stephen F. Buterin, Brian W. Varland, Mark J. Heley, Coleman Hull & van Vliet, PLLP, Minneapolis, Minnesota, for Defendant/Third-Party Plaintiff.

Leah K. Flygare, Bradley D. Fisher, Gerald H. Bren, Michael A. Vellon, Fisher, Bren & Sheridan, Minneapolis, Minnesota, for Third-Party Defendants Jeffrey M. Brown & Associates, Inc., and KNS Building Restoration, Inc.

Leah K. Flygare, Bradley D. Fisher, Gerald H. Bren, Fisher, Bren & Sheridan, Minneapolis, Minnesota, and Michael M. Skram, Timothy J. Leer, Johnson & Condon, PA, Minneapolis, Minnesota, for Third-Party Defendant Interstate Industrial Corp.

---

**INTRODUCTION**

This case arises out of the design and construction of a Target store's rooftop-parking deck in Bronx, New York.  Plaintiff Target Corporation ("Target") contracted with Defendant Greenberg Farrow Architecture, Inc. ("GFA") to design the deck's core and shell.  The project was completed in 2004.

In 2006, Target brought claims against GFA for breach of contract, negligence, and indemnification, alleging purported errors and omissions in the design and construction of the parking deck.  The parties resolved that action in a March 5, 2008 settlement agreement.  As part of that agreement, Target and GFA released each other from all claims relating to the design or construction of the deck except "future claims for bodily injury or property damage . . . caused, in whole or in part, by latent defects in the work performed by GFA [or its subcontractors]."

On December 3, 2008, a car struck one of the deck's precast concrete panels, causing the panel to move away from the building.  A subsequent investigation revealed that many of the structural connections attaching the panels to the parking deck's steel frame had failed.  Target commenced the instant action on December 3, 2010, asserting claims for breach of contract, negligence, and indemnification.  Two motions are presently before the Court:  GFA's Motion for Summary Judgment, and Target's Motion to Exclude Expert Testimony.  For the reasons that follow, the Court will deny GFA's Motion and grant Target's Motion.

**BACKGROUND**

Target retained GFA in 2002 to provide architectural and design services for the construction of a Target retail store in the Riverdale Plaza in New York City ("Riverdale store"). GFA also agreed to provide architectural and engineering design services for construction of adjacent retail space, including a roof-top parking deck. Target further contracted with Third-Party Defendant Jeffrey M. Brown & Associates, Inc. ("JMB") to be general contractor and construction manager for the project. (Varland Aff. Ex. T.) JMB subcontracted the project's waterproofing and concrete work to Third-Party Defendants KNS Building Restoration, Inc. ("KNS"), and Interstate Industrial Corporation ("IIC"). (Id. Exs. U & V.)

The parking deck is a composite lightweight concrete slab on a metal deck supported by a steel frame. (Id. Ex. B at 1.) The frame also supports precast concrete panels that extend above the roof, forming a parapet wall[1] around the perimeter of the deck. (Id. at 2.) Each panel is connected to the deck via two slotted, threaded-rod connections cast into the back of the panel and welded to the frame. (Id.)

The parking deck has a concrete topping slab on top of waterproofing and insulation elements, all resting on a concrete structural slab. (Id. at 5.) GFA's designs for the interface between the parking deck and the precast panels called for a 10-inch curb with a "1 in. max" gap between the back of the curb and panel filled with various

---

[1] A parapet is "a wall, rampart, or elevation of earth or stone to protect soldiers," "raised upon or above the main wall in a permanent fortification." Webster's New International Dictionary 1638 (3d ed. 1986).

structural materials.  (Id.)  JMB submitted shop drawings for the design, fabrication, and installation of the precast panels, and after making several red-line changes, GFA approved the design.  (Id. Ex. Z at 59, 98, 119.)

Construction began in January 2003, and GFA issued a statement of Substantial Completion in July 2004.  (Id. Exs. B, AA.)  Following the parking deck's completion, Target has undertaken various maintenance and repair activities, including repairing cracks in the concrete bases of light poles in October 2005 and straightening light poles in August 2007.  (Id. Exs. BB, EE.)

Previous Litigation

In July 2006, Target brought claims for breach of contract, negligence, and indemnification against GFA to recover damages resulting from alleged errors and omissions it had made in designing and building the parking deck.  (Id. Ex. J.)  The parties settled the matter on March 5, 2008.  (Id. Ex. K.)  As a part of the settlement agreement, Target agreed to "release and forever discharge" GFA "from and against any and all claims . . . and causes of action of every type and character, relating to or in connection with" the design and construction of the Riverdale store.  (Id. at 4.)  This release, however, did not extend to "future claims . . . caused, in whole or in part, by latent defects in the work performed by GFA."  (Id.)  Target acknowledged in the settlement agreement that it was unaware of any latent defect claim at the time.  (Id.)

In early 2008, Target hired Walker Restoration Consultants ("Walker"), a firm specializing in the evaluation and restoration of parking structures, to assess the condition of several parking structures, including the deck at the Riverdale store.  (Neiderer Dep. at

26, 145-46.)  In reports issued in February, March, and November 2008, Walker

concluded that "no immediate or safety-related repairs [were] required," (Doc. No. 55 Ex.

11 at 3), and "[p]recast walls [were] generally in good condition," (id. at 11).  Walker did

observe several cracks and leaks in the parking deck and recommended that Target

address these concerns by either repairing trip hazards and leaks on an as-needed basis,

routing and sealing all cracks and joints, or removing and replacing the topping slab

altogether.  (Id. Ex. 12 at 3.)

<u>December 3, 2008 Automobile Collision</u>

On December 3, 2008, a vehicle struck one of the precast concrete panels on the

rooftop-parking deck.  (Varland Aff. Ex. F at 1.)  The next day, Gennady Saratovsky of

Goldreich Engineering investigated the site at Target's request and detailed his

observations and recommendations in a letter to Target.  (Id. Ex. L.)  He observed that the

precast panels were separated from the curb by between two and four inches, and that a

two-inch vertical gap existed between the corner panel and the adjacent panels.  (Id. at 2.)

He also noted that "this condition has existed for a number of years," but "was not

addressed until the separation became critical," and recommended that Target

immediately brace the panel to prevent it from falling off the building.  (Id.)  Because

Lankford Construction was already on site repairing bent light poles and cracked light-

pole bases, Target had Lankford brace the panels.  (Koland Dep. at 24.)  Saratovsky also

recommended further investigation to determine whether other potential deficiencies

existed.  (Varland Aff. Ex. L. at 2.)

Target then hired American Engineering Testing, Inc. ("AET") to evaluate the condition of the precast panel connections throughout the building.  (Id. Ex. N.)  AET removed fixtures, ceiling tiles, and wall board inside the store, and it used a fiber-optic scope to directly observe seventy-five connections around the building.  (Id. at 1, 3.)  Sixty-five of those connections were broken and could no longer support the loads they were designed to bear, meaning the panels they connected to the parking deck were at risk of falling off the building.  (Weinstein Dep. at 19-20.)  Target then instituted a comprehensive inspection and repair program.

By letter dated March 26, 2009, Target formally notified GFA of the December 3 collision and the associated damage.  (Varland Aff. Ex. O.)  This letter also relayed Target's belief  "that the entire concrete barrier wall must be replaced as a result of thermal expansion due to a latent structural design defect," and advised GFA that "[t]he repairs . . . are expected to be substantial, and Target intends to pursue any and all available remedies against GFA."  (Id.)

Target then retained WJE Engineers & Architects, P.C. ("WJE") to investigate and determine the cause of the precast panel connection failures.  (Varland Aff. Ex. A.)  After examining GFA's October 2002 bulletin drawings, reviewing other experts' reports and conclusions, and inspecting the parking deck first-hand, WJE concluded that the damages to the precast panel connections were the result of thermal expansion of the topping slab.  (Id. Ex. B at 6.)  WJE also observed that the parking deck as built deviated from GFA's designs and specifications:

> A drainage mat and filter fabric were placed on the structural concrete deck in lieu of the protection board shown in the . . . drawings and two layers of . . . rigid insulation . . . each 2 in. thick, were used instead of one layer, 3 in. thick as shown in the GFA Bulletin 8 drawings.

(Id. at 5.)  Despite these variances, it found the construction "in essential agreement" with the design and that "[t]he contractor faithfully followed the intent of the drawings."  (Id.) According to WJE's analysis, the problem arose from GFA's failure to properly account for thermal expansion of the concrete topping slab in its design.  (Id. at 6-7.)

Weinstein's Expert Opinion

After learning of Target's preliminary investigation, GFA commenced its own investigation and retained Thornton Tomasetti, Inc., ("TT") to investigate the cause or causes of the panel connection failures.  (See id. Ex. E.)  TT's report was prepared by Joel Weinstein, a licensed professional engineer.  (Weinstein Dep. at 6-7.)  Weinstein and Efe Karanci, a senior engineer at TT, visited the parking deck on four separate occasions and reviewed structural and architectural drawings, as well as the reports of Saratovsky and Peter Cicuto, an engineer who had worked on the parking deck.  (Varland Aff. Ex. E at 2.)  In an August 17, 2009 report, TT identified both thermal expansion of the parking surface and impact from snow removal vehicles as possible causes of the connection failures.  (Id.)  The report relied heavily on Saratovsky's and Cicuto's earlier reports. (Id.)

In his February 2009 report, Cicuto examined whether snow removal could have caused the connection failures.  (Id. at 17.)  He surmised that crews "would push the snow up against the . . . precast parapet with a bobcat or a front end loader and eventually

7

dump the snow over the top at convenient locations." (Id.)  After stating that the amount of pressure exerted on the back of the precast panel by the loader is "of indeterminate magnitude," Cicuto continued that "it is safe to assume that the load is in excess of the ultimate capacity of the [precast panel] connections." (Id.)  He did not explain how he arrived at that conclusion.

In August 2009, Saratovsky evaluated the amount of force that snow-removal vehicles would place on the panel connections.  (Id. at 24-28.)  He calculated the forces that a bobcat or front-end loader would generate, taking into consideration the weight and speed of the vehicle, the weight and density of the snow, and the bending and torsion of the panels.  (Id.)  To make these calculations, he did not receive or obtain any specific information about snow-removal procedures, and instead estimated:  (1) the snow was 50% water, and therefore weighed about 2,000 pounds; (2) the typical weight of a bobcat was 6,000-9,000 pounds; (3) front-end loaders weigh 10,000 pounds or more each; and (4) snow-removal vehicles traveled between ten and thirteen miles per hour when plowing.  (Id.; Saratovsky Dep. at 83.)  He concluded that the forces the snow removal vehicles would generate exceeded the amount of force the panel connections could resist. (Varland Aff. Ex. E at 28.)  Saratovsky also calculated that the thermal expansion forces in the topping slab did not exceed the frictional resistance between the topping slab and the rubber membrane underneath, and therefore the topping slab did not induce forces in the precast panel connections.  (Id. at 23.)

In TT's report, Weinstein reviewed Cicuto's and Saratovsky's reports.  (Id. at 4.) He did not perform any independent calculations, and relied wholly on the calculations

and assumptions made by Saratovsky.  (Id. at 4-5; see also Weinstein Dep. at 41-42.)  He

concluded that thermal expansion did not contribute to the connection failures, but that

impact forces generated by snow removal vehicles did.  (Varland Aff. Ex. E at 5.)

According to his report, a bobcat travelling at thirteen miles per hour or a front-end

loader traveling at ten miles per hour would generate forces sufficient to cause the

connection failures.  (Id.)  He reviewed the record and noted that there existed no direct

evidence of damage caused by vehicular impact on a precast panel and that, based on the

evidence, there was no way to determine whether any damage on the parking deck was

made by a snow-removal vehicle.  (Weinstein Dep. at 86, 107-09.)

Despite these factual gaps, Weinstein opined that there were probably a hundred

or more impacts of snow-removal vehicles over the course of several years that led to the

panel connection failures and that "[p]ossibly 200 to 400 impacts" had to occur to sever

all of the connections.  (Id. at 54-55.)  The impact forces created by bobcats and front-end

loaders pushing compressed snow, according to Weinstein, exceeded the capacity that the

panel connections could withstand.  (Varland Aff. Ex. E at 5.)  The report further noted

that bent or missing mesh screens, bent guardrail posts, missing cables, and cracked

concrete light pole bases all supported this conclusion.  (Id.)

### Evidence of Snow Plow Procedures

Meadowland Contracting ("Meadowland"), the company that provided snow-

removal services for the parking deck, was instructed to keep the snow piles eight feet

from the deck walls.  (Munch Dep. at 72-73.)  Meadowland used bobcats and pickup

trucks on the parking deck.  (Id. at 21, 74-75, 81.)  Drivers would push snow towards the

center of the parking deck, parallel to the precast panels, and then towards designated snow storage areas. (Id. at 83-87; Doc. No. 47 Ex. N.)  Eventually, Meadowland would dump the snow over the wall at the southeast corner of the deck.  (Munch Dep. at 74; Doc. No. 47 Ex. N.)  No panel connections were damaged in this corner of the deck. (Doc. No. 47 Ex. O at 15.)  David Kessler, the property manager responsible for day-to-day operations, never observed snow piled against the precast panels.  (Kessler Dep. at 47-48.)  There is also no direct evidence that any snow-removal vehicle collided with a precast panel.

<u>Present Action</u>

Target filed the instant action on December 3, 2010, asserting claims for breach of contract, negligence, and indemnity.   GFA brought third-party claims against JMB, KNS, and IIC for contribution and indemnity (Doc. No. 21).  GFA now moves for summary judgment (Doc. No. 49), arguing that:  (1) Target's claims are barred by the two-year statute of limitations governing improvements to real property, Minn. Stat. § 541.051, subd. 1(a); (2) Target released its claims in the March 2008 settlement agreement; and (3) GFA's design was not the proximate cause of any damages.  (Doc. No. 50.)  For its part, Target moves to exclude Weinstein's testimony based on Federal Rules of Evidence 702 and 403 and the standards set forth in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  The Court heard oral argument on May 3, 2012, the issues have been fully briefed, and the Motions are ripe for disposition.

**I.      GFA's Motion for Summary Judgment**

Because its resolution will determine whether it is necessary to address Target's

Daubert Motion, the Court addresses GFA's summary-judgment Motion first.  GFA

argues that it is entitled to summary judgment for three reasons:  (1) the statute of

limitations bars Target from recovery; (2) Target released its claims in the parties' 2008

settlement agreement; and (3) GFA's design was not the proximate cause of any damages

to the parking deck as a matter of law.  The Court finds these arguments unpersuasive.

**a.  Standard of Decision**

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078-79 (8th Cir. 2008).

### b.  Statute of Limitations

GFA asserts that Target was aware of damages related to thermal expansion of the parking deck before December 3, 2008, and as a result the two-year statute of limitations under Minn. Stat. § 541.051 has run.  Target argues that the defect at issue is the individual panel connection failures, an "unknown, concealed structural defect" that required "destructive probing" to identify, of which it did not become aware until after the December 3, 2008 accident.

To determine whether the statute of limitations has run, the Court must first determine what exactly constitutes the damages in this case.  See, e.g., Hyland Hill N. Condo. Assoc., Inc. v. Hyland Hill Co., 549 N.W.2d 617, 621-22 (Minn. 1996). Minnesota law allows courts to aggregate separate injuries under the mantel of "defective construction" for purposes of determining when the statute of limitations begins to run. Day Masonry v. Indep. Sch. Dist. 347, 781 N.W.2d 321, 334 (Minn. 2010) ("[A] party need not be aware of the extent of its injury for the statute of limitations to begin to run so long as the party is aware of the injury and the need for repairs."); Hyland Hill, 549 N.W.2d at 621 ("To draw a line between roof, masonry, patio or sundeck defects strikes us as arbitrary.").  However, courts are not *required* to aggregate separate injuries if the cause, location, and type of injury sufficiently differ from the initial damage discovered. See Fuhr v. D.A. Smith Builders, No. A04-2457, 2005 WL 3371035 at *4 (Minn. Ct. App. Dec. 13, 2005) (concluding that Hyland Hill does not require homeowners to choose between destructive investigative action and a loss of remedy); Trips v. Yaggy Colby Assoc., Inc., No. A04-718, 2005 WL 14925 at *4 (Minn. Ct. App. Jan 4, 2005)

12

(interpreting <u>Hyland Hill</u> as permitting rather than mandating courts to define injuries caused by the HVAC system and injuries caused by defective vapor barrier as one injury).  In other words, while Target may not distinguish "the *symptoms* of defective workmanship from the underlying deficiency itself," <u>Greenbrier Vill. Condo. Two Ass'n, Inc. v. Keller Inv., Inc.</u>, 409 N.W.2d 519, 524 (Minn. Ct. App. 1987), the question is whether it was aware of the particular injury for which it now seeks recovery.  <u>See Pamida, Inc. v. Christenson Bldg. Corp.</u>, 285 F.3d 701, 704-05 (8th Cir. 2002) ("The judicial tendency in these cases . . . has been to focus on the nature of the defect . . . . Now, the . . . focus [is] on the injury, not its cause.").

In the instant case, the question is whether the damages that Target complained of in its 2006 lawsuit and the damages to the garage that Walker reported in 2008 put it on notice that a cause of action existed concerning the thermal expansion of the topping slab or the precast panel connections.  In the first action, Target complained of underdesigned structural steel, inaccurate dimensions on the design drawings, inadequate structural design for light poles, improper storm drainage design, and incorrect and potentially dangerous errors in the slope and dimensions of the parking ramp.  (Varland Aff. Ex. J at 3-4.)  Walker recommended in its 2008 reports that Target take action to reduce water leakage and prevent concrete deterioration by, among other things, repairing trip hazards, removing and replacing failed joint sealants and expansion joints, and routing and sealing cracks in the topping slab.  (Doc. No. 55 Ex. 11 at 3.)

Although these problems might be related to or the result of GFA's alleged defective construction to the extent that thermal expansion caused them, they are far

removed from the precast panel connections.  Cracks, trip hazards, and failed joint

sealants do not have an obvious connection to the integrity of the hardware connecting

precast concrete panels to the parking deck.  Moreover, although Hyland Hill allows

courts to aggregate separate injuries under the mantel of defective construction, it does

not *require* courts to do so.  Indeed, both Hyland Hill and Trips noted that it would *not*

have been an abuse of discretion for the district courts to have distinguished between

different types of injuries rather than lump them together under the "defective

construction" umbrella.  See Hyland Hill, 549 N.W.2d at 621; Trips, 2005 WL 14925

at *4.  Here, the connection failures are not simply larger and farther-reaching

manifestations of the same injury, different from Target's first complaint and Walker's

recommendations only in terms of the extent of damage.  Cf. Day Masonry, 781 N.W.2d

at 333-34 (concluding that because the plaintiff was aware of the existence of a leakage

problem, the extent of the leakage was irrelevant for purposes of beginning the statute of

limitations).  Because the asserted damages are so different that Target cannot be said as

a matter of law to have had notice that the precast panel connections might fail, the Court

concludes that the injury at issue in the present litigation is the failure of the precast panel

connections.

Now that the damages have been identified, the Court can address GFA's statute-

of-limitations argument.  Minnesota law provides in relevant part:

> [N]o action by any person in contract, tort, or otherwise to recover damages
> for any injury to property, real or personal, or for bodily injury or wrongful
> death, arising out of the defective and unsafe condition of an improvement
> to real property, shall be brought against any person performing or
> furnishing the design, planning, supervision, materials, or observation of

> construction or construction of the improvement to real property or against
> the owner of the real property more than two years after the discovery of
> the injury . . . .

Minn. Stat. § 541.051, subd. 1(a).[2]  This two-year period "begins to run when an

actionable injury is discovered, or with due diligence, should have been discovered,

regardless of whether the precise nature of the defect causing the injury is known."

Minch Family LLLP v. Estate of Norby, 652 F.3d 851, 858 (8th Cir. 2011) (quoting

Nolan & Nolan v. City of Eagan, 673 N.W.2d 487, 497 (Minn. Ct. App. 2003)).  The

plaintiff does not need to be aware of the full extent of the injury, so long as it is aware of

some injury.  Day Masonry, 781 N.W.2d at 333-34.

GFA relies on Dakota County v. BWBR Architects, Inc., 645 N.W.2d 487 (Minn.

Ct. App. 2002), to argue that Target had notice of the damages before December 3, 2008.

In BWBR, the plaintiff began noticing leaks in the building in 1992, and by 1994 it had

repaired or inspected water infiltration issues on every side and floor of the building.  645

N.W.2d at 490.  Invasive repairs in 1994 revealed faulty construction, and in 1997, a

masonry consultant thoroughly investigating a chronic leak found substandard

construction problems that were "not readily noticeable because of concealment by walls

and ceilings."  Id. at 491.  The court concluded that knowledge of the injury, not the

defect, triggered the statute of limitations in 1994.  Id. at 492.

---

[2] The parties assume without discussion that Minnesota's statute of limitations applies.  As this choice-of-law question is uncontested and was never raised during the proceedings in this action, the Court also assumes, without deciding, that Minnesota's statute of limitations applies here. See, e.g., Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 705 (5th Cir. 1999) (applying Texas law where both parties assumed Texas law applied).

Unlike <u>BWBR</u>, Target was not aware of the precast panel connection failures for years before finally performing a thorough investigation.  Unlike <u>BWBR</u>, Target had not been experiencing precast panel connection failures before the December 3, 2008 collision and ensuing investigation.  And unlike <u>BWBR</u>, it is unclear whether Target would have discovered failed connections had it undertaken so invasive an investigation before December 3, 2008.  Because the precast panel connection failures are separate and distinct from any earlier-reported damages to the parking deck, the statute of limitations did not begin running until Target became aware of the connection failures, which undisputedly occurred on December 3, 2008.  Accordingly, the two-year limitation in Minn. Stat. § 541.051 does not bar the instant action.

### c.  2008 Settlement Agreement

GFA also argues that Target released the present claims in the parties' March 2008 settlement agreement.  Under that agreement, Target released all claims against GFA except those for damages "caused, in whole or in part, by latent defects."  A defect is latent when it cannot be discovered by a person of competent skill using ordinary care. <u>Gibbar v. Calvert Fire Ins. Co.</u>, 623 F.2d 41, 44 (8th Cir. 1980) (citation omitted). Whether a particular defect is latent is a question of fact.  <u>See, e.g.</u>, <u>United States v. Lembke Const. Co., Inc.</u>, 786 F.2d 1386, 1388 (9th Cir. 1986).

GFA argues that the panel connection failures are not latent defects because the accuracy of dimensions in GFA's design documents was a central issue in the parties' previous litigation.  This is hard to square with the fact that Target had no notice or knowledge of the connection failures before December 3, 2008.  Walker, a firm with

expertise in inspecting parking decks, examined the parking deck at Target's request and raised no concerns about the precast-panel connections.  To determine that the connections had indeed failed all around the parking deck, Target had to tear up the topping slab and look behind the walls.  A genuine issue of material fact remains as to whether the precast panel connection failures should have been discovered by a person of competent skill using ordinary care before December 3, 2008, and accordingly, summary judgment is inappropriate on these grounds.

### d.  Proximate Cause Is a Jury Question

In its final argument, GFA asserts that because the parking deck was not constructed in strict accordance with its plans, its design is not the proximate cause of any resulting damages as a matter of law.  It relies on Goette v. Press Bar & Café, Inc. for the proposition that "[t]he plans and designs of a professional are not the proximate cause of an injury if the work was not constructed or performed according to the plans."  413 N.W.2d 854, 856 (Minn. Ct. App. 1987) (citing Hoehn v. Minn. Mining & Mfg. Co., 79 N.W.2d 19, 24 (Minn. 1956)).  There, the contractor chose to completely ignore the architect's remodeling plans, and this deviation caused the subsequent collapse of a parapet, damage to the building, and injuries to several workers.  Id. at 855.

In the instant case, however, whether the subcontractors' deviation from GFA's plan is the direct and proximate cause of the injury is contested.  The existence of proximate cause is "usually a question for the jury [unless] . . . 'reasonable minds could reach only one conclusion.'"  Lietz v. N. States Power Co., 718 N.W.2d 865, 872 (Minn. 2006) (quoting Canada v. McCarthy, 567 N.W.2d 496, 506 (Minn. 1997)).  In

Goette, the parties agreed that the subcontractor's deviation from the architect's plans was the proximate cause of the injury.  413 N.W.2d at 855-56.  No such agreement exists here; the parties disagree as to what caused the damage to the parking deck—Target argues that it was thermal expansion, and GFA argues that it was either Target's snow removal practices or the subcontractors' failure to construct the parking deck in strict accordance to the plans.  The record contains evidence supporting each assertion. Moreover, WJE opined that even if the subcontractors had built the parking deck according to GFA's plans, the connections still would have failed "because the design still failed to allow for sufficient space to accommodate the thermal expansion of the topping slab."  (Varland Aff., Ex. C at 3.)  This is a genuine dispute about a material fact that must be resolved by the jury.

## II.   Target's Motion to Exclude Expert Testimony

Because summary judgment is not warranted, the Court must address Target's Daubert Motion.  It challenges Weinstein's proffered opinion testimony, arguing that it is contrary to undisputed facts in the record and based on unverified speculation.  For the following reasons, the Court agrees.

### a.  Standard of Review

Federal Rule of Evidence 702 governs the admission of expert testimony.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Court, acting as a "gatekeeper," must evaluate whether proffered expert testimony satisfies this Rule, bearing in mind that the touchstone for admission is assistance to the trier of fact.  See, e.g., Lee v. Anderson, 616 F.3d 803, 808 (8th Cir. 2010).  "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citation omitted).  The Court has broad discretion in determining whether expert testimony passes muster.  E.g., First Union Nat'l Bank v. Benham, 423 F.3d 855, 861 (8th Cir. 2005) ("We give district courts great latitude in determining whether expert testimony meets the reliability requisites of Rule 702.").

Daubert set forth four "general" factors to be considered when evaluating the admissibility of expert testimony:  (1) "whether [the expert's theory] can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance."  509 U.S. at 593-94.  The Court stressed, however, that the inquiry must remain "a flexible one," id. at 594, and hence these four factors are neither mandatory nor exclusive.  E.g., Shuck v. CNH Am., LLC, 498 F.3d 868, 875 (8th Cir. 2007); Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) ("[A] court should use, adapt, or reject Daubert factors as the particular case demands.").  Other potentially relevant factors include "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative

explanations; and whether the proposed expert sufficiently connected the proposed

testimony with the facts of the case." Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d

638, 643 (8th Cir. 2009) (citations omitted).  At bottom, "[t]here is no single requirement

for admissibility," as long as "the proffer indicates that the expert evidence is reliable and

relevant."  Unrein, 394 F.3d at 1011.

A court must remain cognizant that Rule 702 "reflects an attempt to liberalize" the

admission of expert testimony and "clearly is one of admissibility rather than exclusion."

Polski v. Quigley Corp., 538 F.3d 836, 838-39 (8th Cir. 2008).  Yet, Rule 702's ultimate

goal "is to protect juries from being swayed by dubious scientific testimony."  In re Zurn

Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 613 (8th Cir. 2011).  When expert

testimony is "so fundamentally unsupported that it can offer no assistance to the jury," it

should be excluded.  Id. at 614 (citation omitted).

### b.  Weinstein's Opinion Lacks Factual Basis

"As a general rule, the factual basis of an expert opinion goes to the credibility of

the testimony, not the admissibility."  Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th

Cir. 2002) (quotation omitted).  It is also true, however, that an expert's opinion "so

fundamentally unsupported that it can offer no assistance to the jury" must be excluded.

Neb. Plastics, Inc. v. Holland Colora Americas, Inc., 408 F.3d 410, 416 (8th Cir. 2005).

Even a theory that meets certain Daubert factors should not be admitted if it does not

apply to the specific facts of the case.  Concord Boat Corp. v. Brunswick Corp., 207 F.3d

1039, 1056 (8th Cir. 2000) (citations and footnote omitted).  "Where opinion evidence is

connected to existing data only by the *ipse dixit* of the expert, a district court may

conclude that there is simply too great an analytical gap between the data and the opinion proffered." Smith v. Cangieter, 462 F.3d 920, 924 (8th Cir. 2006) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

Weinstein's opinion is that the connection failures were caused by large piles of snow repeatedly being pushed into the precast panels by bobcats and front-end loaders traveling at between ten and thirteen miles per hour.  In support of his theory, Weinstein points to scratched and bent concrete posts, one bent decorative mesh screen, and one missing screen.  He fails to address several key facts, including the lack of physical evidence of any snow-plow vehicles impacting a precast panel.  By his own admission, there is no evidence of damage "caused by the vehicular direct impact on a precast panel" and, based on the evidence, there is no way to determine whether any damage on the parking deck was made specifically by a snow-removal vehicle as opposed to any other vehicle on the deck.  (Weinstein Dep. at 86, 107-09.)

Furthermore, Weinstein's opinion fails to address the lack of correlation between the undisputed snow-removal procedures and the panel-connection failures. Meadowland's procedures and observers' testimony provide that snow was plowed parallel to the curbs (and thus parallel to the panels), that snow piles were kept several feet away from the precast panels, and that snow was collected in the southeast corner of the deck before it was shoveled over the side.  Investigations showed that none of the connections in the southeast corner failed, and snow was not routinely piled up against the panels.  When asked how his opinion squared with these facts, Weinstein responded that he did not believe the testimony.  (Id. at 68.)  Disbelieving another witness's

21

testimony, however, does not replace the facts on the record with contrary facts that support his opinion.  Concord Boat Corp., 207 F.3d at 1056; see also Solheim Farms, Inc. v. CNH Am., LLC, 503 F. Supp. 2d 1146, 1151 (D. Minn. 2007) (Magnuson, J.) (finding expert testimony irrelevant where the expert disregarded testimony contrary to his untested assumptions).

Weinstein's theory requires snow to have been repeatedly piled up against and smashed into the precast panels.  The record is devoid of any facts supporting this proposition.  No witness has testified to a single occurrence of snow-removal vehicles colliding with the panels.  Weinstein has not explained how such impacts could occur without leaving physical marks on the panels themselves, and he has offered no reasoned explanation for how the connections in the southeast corner of the parking deck—where the snow was constantly piled to be shoveled over the side and thus where precast panel connections would be most likely to fail—escaped unscathed.  Weinstein concedes that a force much smaller than a snow plow traveling at ten to thirteen miles an hour could cause the same damage to the screens, but he provided no analysis regarding the stress capacity of the mesh screens that supports his conclusion that the damage was caused by snow-removal activities.  (Weinstein Dep. at 84-85.)  And while he notes that the bent posts are "pretty compelling evidence that those posts were impacted in some way by a vehicle or snow being pushed by a vehicle," (id. at 106-07), only speculation supports his ultimate conclusion that they were caused by "snow removal."  The analytical gap between the evidence on record and Weinstein's opinion is simply too great.  See Cangieter, 462 F.3d at 924.

Finally, even if GFA were able to show that Weinstein's opinion is sufficiently reliable, admission of the opinion would not necessarily follow.  As the Supreme Court highlighted in Daubert, a judge "assessing a proffer of scientific testimony under Rule 702 should also be mindful of other applicable rules," including Federal Rule of Evidence 403, which permits the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  509 U.S. at 595.  For this reason, district courts enjoy even wider latitude than normal when determining whether an expert's testimony should be admitted.  Daubert, 509 U.S. at 595 ("Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.").

Given the speculative basis underlying Weinstein's opinion, the Court believes that great potential to mislead the jury exists here.  See, e.g., Tunnell v. Ford Motor Co., 330 F. Supp. 2d 731, 741-42 (W.D. Va. 2004) (excluding expert testimony based on speculation under Rule 403).  The testimony's shaky factual foundation drastically reduces its probative value.  Moreover, the expert "patina" that might attach to Weinstein's testimony could lead a jury to give his causation theory more credibility than it deserves.  United States v. Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999).  It is this Court's obligation as a gatekeeper to prevent that from happening.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED:**

1) Defendants' Motion for Summary Judgment (Doc. No. 49) is **DENIED** in its entirety; and

2) Plaintiff's Motion to Exclude Expert Testimony (Doc. No. 44) is **GRANTED**, and Weinstein is precluded from opining at trial in this matter that the damages to the precast panel connections were caused by snow-removal activities.

Date:  May 31, 2012                         s/Richard H. Kyle
                                            RICHARD H. KYLE
                                            United States District Judge